**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.**

**REBA L. HARRIMAN**

    **Plaintiff,**

**v.**

**STATE DEPARTMENT OF HUMAN SERVICES FOR COLORADO MENTAL HEALTH INSTITUTE AT PUEBLO.**

    **Defendants.**

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff, Reba L. Harriman, through her undersigned counsel, for her Complaint and Jury Demand, states the following:

**JURISDICTION AND VENUE**

1. Jurisdiction is proper in this Court pursuant to 42 U.S.C. §§ 1981a.(a)(2), 1983, 1988, 12112, and 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices alleged were committed within the District of Colorado.

3. Plaintiff Harriman has timely complied with all administrative, jurisdictional, and legal prerequisites to the filing of this action. Specifically, on or about October 8, 2018, she received a Notice of Right to Sue from the United States Equal Employment Opportunity Commission, by letter dated October 4, 2018.

1

## PARTIES

4. Plaintiff Reba L. Harriman is an individual residing in Pueblo, Colorado.

5. Defendant Colorado Department of Human Services is the governing body of the Colorado Mental Health Institute at Pueblo.

## FACTUAL ALLEGATIONS

6. Plaintiff Reba L. Harriman was a dedicated long-term employee (nearly 25 years) at the Colorado Mental Health Institute at Pueblo ("Hospital"), where she worked since 1994. She started as a Radiologic Technician, then transferred to an Administrative Assistant II position in the Outpatient Clinic when her son was born, then worked in the laboratory, then transferred to an Administrative Assistant III position in the Nursing Department, before getting hired as the Administrative Assistant III in the Social Work Department, under Supervisor Adelia Dawn Tripp.

7. In all of her positions and career at the Hospital over nearly 25 years, Ms. Harriman was successful, enjoyed good performance reviews and respect from her co-workers, and was a dedicated employee, planning to work at the Hospital until retirement.

8. In 2014, while working in the Nursing department, Ms. Harriman, who officed near Supervisor Tripp, saw how busy Tripp was. She approached Tripp stating that she observed Tripp would benefit from an assistant. Tripp, apparently in favor of Ms. Harriman's suggestion, created an Administrative Assistant III position and Ms. Harriman was hired into the newly created position by Tripp in early January, 2015.

9. All seemed to progress well and as expected for Ms. Harriman's newly created position, where new role solutions and tasks were being developed.

10. As her role developed, Ms. Harriman took pride in her work and enjoyed being a problem solver, someone who always got the job done.

11. Initially, Ms. Harriman consistently received favorable performance evaluations.

12. In March of 2016 for review period 4/1/15 – 3/31/16, Supervisor Tripp indicated specifically that Ms. Harriman's overall performance was rated as "Proficient, Successful, and Occasionally Exceeds Expectations."

13. In March of 2017 for review period 4/1/16 – 3/31/17, Supervisor Tripp indicated specifically that Ms. Harriman's overall performance was as follows:

> This rating level encompasses a range of expected performance. It includes employees who are successfully developing in the job, employees who exhibit competency in work behaviors, skills, and assignments, and accomplished performers who consistently exhibit the desired competencies effectively and independently. These employees are meeting all the expectations, standards, requirements, and objectives on their performance plan and, on occasion, exceed them. This is the employee who reliably performs the job assigned and may even have a documented impact beyond the regular assignments and performance objectives that directly supports the mission of the organization.

14. Initially, Ms. Harriman was treated well by her supervisors and co-workers at her job. Supervisors Michele Manchester and Tripp were respectful and complimentary to Ms. Harriman.

15. Ms. Harriman regularly received complimentary emails, positive remarks and kudos for her work. Relationships with her supervisors and co-workers were appropriate and collegial.

16. Ms. Harriman handled the typical pressures and challenges of the job in a reasonable manner, as reflected in her performance evaluations.

17. Unfortunately, Ms. Harriman has brain arteriovenous malformations ("AVMs"); she was first diagnosed with them in 1987. In short, these are non-malignant type brain tumors that require medication to manage.

18. In the early 1990's, over 20 years ago, Ms. Harriman had three brain surgeries to remove some of the AVMs.

19. Since that time, Ms. Harriman has been able to manage the effects of the AVMs with medication, and the AVMs have not caused Ms. Harriman any problems. She has been able to perform her work duties without any accommodation. Her co-workers and supervisors were unaware of the AVMs.

20. Everything changed suddenly in September, 2017.

21. While Ms. Harriman was making discharge travel plans for a patient, she went to the travel office to speak with co-worker Sheryl Nickerson and requested clarification about newly required signatures on travel plans.

22. Ms. Harriman, made an off-hand, joking comment to co-worker Nickerson, to the effect that if she (Harriman) "had not had so many brain tumors, she might be able to figure this out." Nickerson reported this discussion to human resources Benefits Coordinator, Nancy Schmelzer. Schmelzer and Nickerson further reported Harriman's disability to others in the workplace.

23. From the moment she revealed her disability, there was an abrupt and bizarre change in the manner in which Ms. Harriman's co-workers and supervisors

treated her. Ms. Harriman was immediately subjected to disparate treatment on the basis of her disability.

24. After they learned of her disability, Tripp and Manchester, and others under their control and supervision, began to "gaslight" or psychologically manipulate Ms. Harriman into doubting her own memory, perception, and intelligence.

25. Supervisors Tripp and Manchester began unfairly scrutinizing Ms. Harriman's work performance, making disparaging and hostile statements to the effect that Ms. Harriman was mentally incapable of understanding tasks and directives. Each time Ms. Harriman would ask a normal question or ask for normal clarification about job tasks or expectations, Supervisors Tripp and Manchester would belittle her, act as though she were a bother, and state or imply that she should already know the answer. Tripp and Manchester spoke to Ms. Harriman this way on a daily basis.

26. After learning about Ms. Harriman's disability, co-worker Francine J. Barbera (who was the program assistant to Supervisor Manchester) also became hyper-critical of Ms. Harriman, making snide statements such as, "You shouldn't have to ask questions anymore, you've worked here for 25 years," and "You just don't get it." Barbera would write intimidating, punitive emails to Ms. Harriman, with statements worded all in CAPS and in red.

27. Barbera often embarrassed Ms. Harriman by telling other co-workers Ms. Harriman could not follow directions or understand simple requests.

28. Supervisors Tripp and Manchester were aware of Barbera's hostile treatment of Ms. Harriman and did nothing to correct or curtail it.

29. As a result of Tripp's, Manchester's and Barbera's hostile treatment of her on the basis of her disability, Ms. Harriman began having extreme stress and anxiety, severe headaches, sleeplessness, loss of appetite, and became fearful of losing her job.

30. In October 2017, Supervisor Tripp told Ms. Harriman to look for another job, and stated that she believed Ms. Harriman could not do her job because of her medical condition.

31. By this time, Ms. Harriman was already suffering severe emotional distress and unbearable anxiety over the fact that co-workers were treating her as mentally ill and disabled.

32. In November 2017, Ms. Harriman requested a transfer to another position in the ACBU unit. The Admissions Director, Lawrence Rodriguez, offered her a position in Department C2, at a different location on the Hospital campus, away from those who were harassing her.  During Ms. Harriman's second week in the new position, Supervisor Tripp and another subordinate supervisor, Marcella Lopez-Hardy, effectively rescinded the transfer and told Ms. Harriman that she either must do both the new job and the old job (an impossible task), or go back to the old job in the Social Work Department.

33. Supervisor Tripp knew that it would be impossible for Ms. Harriman to do both jobs because the two units were in separate buildings across campus from each other, and that she was giving Ms. Harriman no choice but to go back to the Social Work Department job.

34. Following this meeting, Supervisors Tripp and Manchester substantially increased Ms. Harriman's work duties, and gave her additional tasks that were not part of her job description.

35. Although Ms. Harriman diligently tried to complete the new tasks, nothing she did pleased Defendants.

36. Supervisors Tripp, Manchester and co-worker Barbera continued their "gaslighting" of Ms. Harriman. When she sought normal clarification and guidance, they would unfairly accuse her of having trouble following directives, failing to follow through, and failing to understand the job duties.

37. When Ms. Harriman would ask specific questions, the Defendants would purposefully give vague answers or answer her questions with other questions, giving no meaningful guidance to her and effectively setting her up to fail.

38. These mind games had the intended effect of making Ms. Harriman doubt herself, her intelligence and her abilities, and caused extreme distress, anxiety and emotional turmoil on a daily basis. Ms. Harriman was sick to her stomach constantly, and would shake with fear over interactions with Tripp, Manchester and Barbera.

39. Defendant created an untenable work environment for Ms. Harriman. No reasonable individual would have been able to work under these circumstances.

40. In the fall of 2017, Ms. Harriman contacted the Hospital's State Employee Assistance Program, C-SEAP, for counseling help and saw a therapist (Venice Gallegos). She continued to see the therapist until she used up the Hospital's allotted benefit. She then went to a private therapist, whom she continues to see.

41. In January 2018, one of the supervisors in the Social Work Department instructed Ms. Harriman to either apply for ADA accommodations or face progressive discipline for her allegedly unsatisfactory job performance. Ms. Harriman told the ADA Coordinator, Bridget Clawson, that she did not need reasonable accommodations.

42. Nevertheless, Ms. Harriman, in fear of losing her 25 year job at age 52, reluctantly completed the ADA accommodations application in order to avoid the threatened discipline; however, Ms. Harriman indicated on the form that she could perform all of her job duties without accommodation, but pointed out she could possibly work on better time utilization for things she did not routinely do. Ms. Harriman made this statement in relation to all of the new duties Defendants were piling on her following her revelation about her disability.

43. The independent ADA evaluation by a doctor also stated that she did not require accommodations. In February, 2018, Defendant "denied" Ms. Harriman's non-existent request for an ADA accommodation.

44. In early 2018, Supervisor Tripp initiated a mid-year performance evaluation with poor ratings and a discipline plan.

45. Supervisor Tripp emailed the mid-year evaluation to Ms. Harriman and stated in the email, "You won't like it."

46. Ms. Harriman printed out the mid-year performance evaluation, wrote on it regarding all the issues she disagreed with and requested a meeting with Supervisor Tripp to go over it; however, Supervisor Tripp refused to review the evaluation with Ms. Harriman.

47. Instead, Supervisor Tripp imposed a discipline plan upon Ms. Harriman requiring weekly meetings scheduled to occur beginning the first week in March 2018 through April 2018.

48. On March 5, 2018, at the first and only meeting that occurred as part of the discipline plan, Supervisor Tripp gave Ms. Harriman positive feedback for the first week.

49. Following this meeting, after weeks of torment on the basis of her disability, Ms. Harriman consulted the then Assistant Superintendent, Dr. Birgit Fischer about her distress. Assistant Superintendent Fischer suggested they both go to speak with Benefits Coordinator Schmelzer, which they did.

50. At this meeting, Benefits Coordinator Schmelzer stated that others who worked with Ms. Harriman had said Ms. Harriman had a "cognitive disorder."

51. Ms. Harriman protested that statement and told both women she did not have a cognitive disorder.

52. Then, on or about March 12, 2018, without any warning and contrary to the discipline plan, Benefits Coordinator Schmelzer presented to Ms. Harriman a letter signed by Assistant Superintendent Fischer, putting Ms. Harriman on immediate paid administrative leave and referring her for a Psychological Fitness for Duty Evaluation. This was in direct retaliation for Ms. Harriman's complaints about the discrimination against her on the basis of her disability.

53. Anthony Cordova, the Workers' Compensation processor at the Hospital, instructed Ms. Harriman to apply for Workers' Compensation, although he said it would

be denied. Ms. Harriman protested again that she was not disabled, but complied with Mr. Cordova's mandate. Just as Mr. Cordova said, the application was indeed denied.

54. Defendant forced the ADA evaluation and Worker's Compensation in order to make Ms. Harriman appear to be disabled and unable to do her job.

55. By the time Ms. Harriman was put on administrative leave, she was a nervous wreck, scared to ask her department members and supervisors anything for fear of retribution and continued mistreatment. The psychological manipulation ("gaslighting") had had its intended effect, and caused her to doubt herself and her abilities. She suffered serious health issues, intense anxiety and stress that she had never experienced before.

56. Ms. Harriman was forced through two Fitness for Duty evaluations, which determined that Ms. Harriman was not fit to return to duty, not because of her disability, but because of all of the stress and anxiety caused by the discriminatory disparate treatment by Defendants.

57. Ms. Harriman's paid administrative leave was terminated on April 30, 2018. She was then forced to use all of her other accrued leave under FMLA.

58. Ms. Harriman was also then placed on short term, then long-term disability. Again, this was not due to her AVMs, but due to the severe anxiety and stress disorder she developed at the Defendants' hands.

59. Ms. Harriman suffers from panic attacks and extreme emotional stress when she is near the Hospital or sees one of her prior co-workers' cars on the road. Her health has suffered immensely. In November 2018, Supervisor Manchester sent a letter to Ms. Harriman requesting a meeting. Within 30 minutes of receiving the letter,

Ms. Harriman had a violent emotional reaction that caused a grand mal seizure, which caused her to fall and injure herself. Ms. Harriman had not had any kind of seizure in over 15 years.

60. Ms. Harriman's doctor, Melanie Hoffman, PhD, documented by letter that Ms. Harriman conclusively suffered from work-related episodes of emotional and verbal abuse leading to severe symptoms of Generalized Anxiety Disorder (GAD) and Posttraumatic Stress Disorder (PTSD). Dr. Hoffman confirmed that Ms. Harriman has triggers related specifically to what happened to her at work over many months and that the triggered trauma memories cause life-threatening medical symptoms (the seizure) along with psychological symptoms of severe trauma, severe multiple panic attacks per week, and severe anxiety. Dr. Hoffman further confirms that Ms. Harriman had a baseline of normative function before the disparate and discriminatory treatment by Defendants.

61. Defendants intentionally and directly caused Ms. Harriman great anxiety and emotional distress, leading to serious emotional and health disorders that she did not have before. Thus, despite nearly 25 years of excellent service, on December 20, 2018, Ms. Harriman received a separation letter from Supervisor Manchester.

**CLAIM FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**DISABILITY DISCRIMINATION**
**DISPARATE TREATMENT**
**THE AMERICANS WITH DISABILITES ACT**
**42 U.S.C. §§ 12101, et seq.**
**THE REHABILITATION ACT**
**29 U.S.C. §§ 791 and 794**

62. Under the ADA and the Rehabilitation Act, it was unlawful for Defendant to mistreat, harass, terminate, disparately treat or otherwise discriminate against an employee because of that employee's disability or perceived disability if the employee is qualified to do the job with or without reasonable accommodation.

63. Ms. Harriman has a disability or was perceived to have a disability by Defendant.

64. Ms. Harriman's disability or perceived disability was a motivating factor in the Defendant's decisions to mistreat, harass, terminate, and otherwise subject Ms. Harriman to adverse treatment.

65. Defendant engaged in the discriminatory employment practice of disparate treatment on the basis of disability or perceived disability, causing injury to Ms. Harriman in the form of loss of past and future wages and benefits.

66. Defendant engaged in such discrimination willfully and wantonly.

## **DEMAND FOR JUDGMENT**

Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants and award the following:

   a) Injunctive and declaratory relief, including a declaration that the Defendant's actions toward Ms. Harriman were illegal and an injunction preventing Defendant from continuing their illegal conduct;

   b) Damages in such an amount as shall be proven at trial for back pay, including benefits;

   c) Reinstatement or, in the alternative, front pay and benefits, and compensation for other lost employment opportunities;

      d)      Compensatory damages, including damages for emotional distress and humiliation and psychological injury;

      e)      Attorney fees and costs;

      f)      Pre- and post-judgment interest, costs, expert witness fees; and

      g)      Such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 27th day of December, 2018.

*/s/ Janine A. Guillen*
Janine A. Guillen
Jerome Borison
ANDERSON & JAHDE, P.C.
5800 S. Nevada St.
Littleton, CO 80120
Telephone: (303)782-0003
Email: janine@andersonjahde.com
       jerry@andersonjahde.com

*/s/ Theresa L. Corrada*
Theresa L. Corrada
BENEZRA & CULVER, P.C.
633 17th Street, Suite 1450
Denver, CO 80238
Telephone: (303)716-0254
Email: tlcorrada@bc-law.com

*Attorneys for Plaintiff*

Plaintiff's Address:
1477 Tejon Drive
Pueblo West, CO 81007